Thank you and good afternoon. I'd like to reserve five minutes. In this matter, we believe that the force used in connection with the chicken wing hold maneuver was so unreasonable that this court should find as a matter of law that the force used caused a violation of Mr. Tapueluelu's Fourth Amendment right to be free from unreasonable seizure. And there's four facts that help establish this violation as a matter of law. The first is that the chicken wing hold is deadly force. It is force which creates a substantial risk of serious injury or death. The second is that the officer, he intended to use the hold. And under Smith v. City of Hammett, that's an important indication as to whether deadly force is used. The third is that the circumstance did not warrant deadly force. The conduct of Mr. Tapueluelu did not rise to the level where deadly force was needed. And the fourth factor, which is according to defendant's version, is that the chicken wing hold was averted because Mr. Tapueluelu was able to avoid the locking mechanism of the hold. Had he not used his strength, where he was handcuffed on the ground with his hands behind his back and the hold, the officer trying to pull up the elbow and arm to lock the hold. Had Mr. Tapueluelu not avoided that, then the hold would have been complete. And that would have been unreasonable as it is deadly force, which creates a substantial likelihood of serious injury or death. So the question becomes, does the attempt to affect the chicken wing hold in the manner that he did create a substantial risk of serious injury or death? And the answer to that is obviously yes. It clearly does. Thus, the issue is simply whether or not deadly force was used, and it was, and therefore, as a matter of law, the force used was unreasonable. Where's the evidence in the record that a chicken wing hold is deadly force? There's several items. When you say it is deadly force, do you mean that sometimes it results in death, or do you mean that it is the physical equivalent of shooting someone? That is, once you use a chicken wing hold, it is understood by the officers that death may result and that this is only an ultimate, a hold to be used in an extreme circumstance. Well, it's that it creates a substantial risk of injury or death. That's the definition for deadly force, not that it actually creates death. And also, you look not so much as to what the effect is, but what the risks are. Okay, where's the evidence in the record for this? The evidence in the record is that the manual indicates that the hold- This is the manual from the San Francisco Police Department? That is correct. And that's at page 107, where it discussed that constraint holds, which impede the ability to breathe, can cause serious injury, death, and it does cause serious injury and death in the department, per the rules. And, in fact, in the other attached reports, there are circumstances where people may be able to use a chicken wing hold.   Okay. Okay. Okay. Okay. Okay. Okay.   Okay. I know that some people have used- Have died because of their positioning, and it's the positioning that causes it to be a hold, which creates a substantial risk of death. And this is a pretty well established principle throughout not only the ninth circuit but obviously all the circuits. Because it's now noted that when you have a diminished capacity and you have constrained holds that limit your breathing, that that creates a substantial risk of injury or death. And even if it weren't deadly force, the type of force that it is is unreasonable. Graham provides that with the right to seize comes the right to use force. In Graham, the right to seize was a public offense. And in the current case, there is no public offense. So the right to seize has not arisen. I just want to note that there was some statement that the offense was that Mr. Second 643 indicates that if you're in public view, that's not a public place. And the Superior Municipal Court at 23 Cal 3rd 238 provides that you have to be in a non-private place. In other words, a place that's for public in order to satisfy the public element of the intoxicated in public offense. The only basis for possible seizure would be the civil 5150, which is the civil seizure protective custody. And it is interesting that that power is not based on a public offense. The suspect, the person, the detainee is not a suspect. In Graham, we're talking about a suspect. In the 5150 protective custody, we're talking about a patient. A 5150 person is detained only if the officer believes that the individual under 5150.2 needs a psychiatric examination. If he does, then the officer tells the person that he's going to a 72-hour treatment facility under 5157. Then he takes him to a 72-hour facility, and at that point, if he's assessed under 5151 paragraph 2, to determine whether or not he does need an evaluation. If he does need an evaluation, under Health and Welfare Code 5152, he gets the evaluation. So under Durley v. Rutherford, they indicate that an officer should not separate a two, there should not be two classifications of suspects, a mentally disturbed person and an armed and dangerous person. But that is a suspect. In the current case, the Graham factors don't apply because he's not a suspect, he is a patient. And there is a separate classification for a civil protective custody detainee than it is for a public offense detainee, a public offense. Do those sections require the officers to make that judgment in this kind of a situation? Yes. Even though they're not, at this point, they're not going to arrest him for something, it's not likely. In this situation, the officers have to draw a distinction between a protective custody? Yes, because under the law, the only basis they have to seize him is protective custody, because there's no public offense. And that's why we have the 5150, because the authorities can't detain if they believe there's an imminent danger of harm. And that's under Suzuki v. Yin, 617, Fed 2nd, 173 at page 178. You need imminent threat of danger in order to seize an officer. And you have to have probable cause of that imminent threat under Mag v. Wessler, that's M-A-G-W-E-S-S-L-E-R, 960, Fed 2nd, 773. Now this is all reaffirmed in the most recent case of Brimham City v. Stewart, and that's a Supreme Court case of 2006, where it says that the police power does extend to rendering medical aid to a person who is in imminent harm. Mr. Tapalula wasn't in imminent danger. They went to the unit. Oh, wait, he was out on the ledge. He came out, but he wasn't trying to jump. He had been there before. He was just having an asthma attack. The officers recognized that. And at that point in time, there wasn't an imminent threat of injury, but they decided to take him out in any event. But so there is, the right to seize has to come, the right to use force comes with the right to seize. He didn't have the right to seize once he realized he was not in imminent danger at the apartment. He's only not in imminent danger because the officers have gotten him off the ledge. No, the officer didn't get him off the ledge. When the officers came in, he came and answered the door. He was having an asthma attack. He explained to the officers that he went to the window in order to get some air. And then they detained him to see what the circumstances were. Then they realized that he's not trying to harm himself. 5150 is basically... They also thought that it was on meth. That is correct, but 5150 is designed if you intend to harm yourself or you're a danger to yourself. He is not a danger to himself. He was having a medical problem, asthma. That's what he needed, it was an asthma circumstance which he regularly has had. So they did not have that imminent danger that he was trying to hurt himself. And that's what's required under 5150. And Suzuki v. Yen says you have to have that imminent threat, otherwise the most sacred right under the Fourth Amendment is diminished. Because the person cannot be secure in his home, his castle, if police officers can come in without some type of high-level justification. What should the officers have done here? Well, what the officers should have done was either leave or to... At what point should they have left? Once they realized that he was not trying to jump out the window. Once they realized he was having an asthma attack, at that time their determination was that he was not in imminent danger. They should not have handcuffed him behind his back where he couldn't breathe, he had difficulty breathing. They could have just left, they could have asked him. Instead what they did is they detained him and unreasonably did so, by handcuffing him, then leg-sweeping him when he got outside, and then put the chicken wing hold on him while he was there. And this is all in light of the 5150... Let's back up just a little bit. We have a call from somebody else who says there's a man on a ledge. That is correct. Do you know who that person was? Actually it was the police officer who saw Mr. Tapalooloo on the edge and so he called it in. They were right to come up to look in to see what the circumstances were. Once they realized that he was not trying to harm himself, they had no right to see him. Okay, but they've got a guy that they think has been on the ledge, looks like he's having an asthma attack, and they also suspect that he's on meth. The apartment's on meth. That's correct. But that doesn't give them a right to seize. The only reason why they have a right to seize is if he has inundated himself. But if they did, if they did, still the method in which they did it is wrong. Under 5150 it states forth the type of rights that the person who is being detained in protective custody has. For example, health and welfare institution code 5325.1, subsection C, says that such a person has a right to be free from harm, including unnecessary physical restraints, being restrained with handcuffs behind your back, making it difficult to breathe, a leg sweep, and being pinned in a chicken wing hole. And that indication, under Garner v. Tennessee, is what the court used to determine what is reasonable police conduct. And in this case, not only does the legislature conduct as to what is reasonable... So the officers should have stopped once they got to the door and once your... Yeah, once they realized he was not an imminent threat, they no longer had the right to seize and or use force. So at that point they should have just gone. And they're sure that he's not in danger to himself. Well, he's not an imminent threat. So if he wanted to jump out the window, he's an imminent threat. Was there no other way for him to get air other than to step out on the ledge? No, what he needed to do, what he did, is call an ambulance. And what the officers said, well, we'll take you outside rather than have you wait here. And they did not have a right to do that. And as a result, the seizure was unreasonable. But even if they had a right to use some force, the type of force that they used was unreasonable. And under, if we look at the video, or the video footage, the video images at page 115 of Exhibit M, one through 15, it becomes obvious that the type of force was unreasonable. Image number seven shows right before the takedown. Eight, it shows the takedown. And then the image 15 shows them all looking at him, which further gives credence to the notion that Justice Scalia's indication that visible fictions should not be adopted credence. Clearly, Mr. Tapalooloo wasn't going from a sitting position and throwing his head down into the ceiling. But the essence of it is, under Alexander, the city and county of San Francisco, and Blankenhorn v. Smith, and Blankenhorn v. Smith is 2-9-2-5-3-11-77, is once you have unreasonable conduct on the Fourth Amendment, the constitution of violation is established. And once they use the chicken wing hole or attempted to, that, in essence, constituted a violation of the Fourth Amendment in terms of the reasonable force used. And I'm going to reserve the remaining time for rebuttal. Thank you. Roberts. Gaffin, Your Honors. The first point I would like to address is the discussion that Appellant's Counsel just had regarding the chicken wing hole. There are no facts. There are no cases. There's nothing that says that the use of a chicken wing hole is lethal force or likely to cause death or anything remotely like that in the record or in the case law. The only evidence that we have related to what a chicken wing hole is and how it was used is Officer Boosie's deposition testimony and his declaration testimony. And what he says happened is that when Mr. Topolulu was on the ground, and this is undisputed, as Mr. Topolulu was struggling to either get on his back or get on his chest, which could possibly restrict his breathing, in order to prevent that from happening, Officer Boosie took one of Mr. Topolulu's arms and moved, tried to move it from this position to that position. That's what we're talking about. But you know, the odd thing about it, because if it goes on his chest, there's no doubt that there's a danger, given this asthmatic condition that's known, that breathing is going to be restricted, right? That was something the officers were trying to prevent happening, even though he was struggling, yes. And there is no evidence at all that he ever went on his chest. Well, no. The evidence you rely on, you ask the officer, was he ever on his chest, and he says, I don't think so. He doesn't say no. The other officers said no. And there's no evidence that he was. This is the plaintiff's case. They have to prove some evidence that he was on his chest. And even if during a struggle with police officers, if he's able to move himself onto his chest momentarily, that doesn't mean the officers are doing it. That doesn't mean that's an excessive use of force for this strong individual to be able to struggle and get himself onto his chest. But we don't even have those facts. The cases which have held that there may be an unconstitutional use of force is when the officers have placed someone on his chest, put weight on the individual's back, the individual stopped breathing, and they continued to apply that pressure to the individual. Well, isn't this all a question of fact for a fact finder to wrestle with? This was a summary judgment disposition, and I'm listening to all these facts back and forth. What exactly was the nature of the so-called chicken hole? When was it applied? How hard was it applied? Was he on his back? Was he on his chest? It seems to me that it's laden with facts for a fact finder to determine. Isn't that the right way to dispose of a case like this? If there were facts that were in dispute. You mentioned that one of the officers said, I don't know, maybe yes, maybe no. That's not correct. The officer said, it's in your brief. You said the officer who put on the hole, was he ever on his chest? He says, I don't think so. You said that means it's undisputed. It doesn't mean to me I couldn't draw that conclusion. It doesn't establish through that officer that there's evidence that he was on his chest, certainly. And then you look to other evidence. There's no one else who says that he was on his chest. The other officers say they never saw him on his chest. So if the question is, is there any evidence in the record that Mr. Tapalula was on his chest, and the only thing you have is one officer saying, I don't think so, that is not evidence that would support a disputed fact as to whether he was on his chest. Well, don't you think a jury should be entitled to assess the credibility of these witnesses? I mean, there are not a lot of people there. I realize the officers were trying to do a good deed. But nonetheless, all the information is within their knowledge, and they're testifying under oath. And is that the proper place to have cross-examination, to flush out the entire dimension of their testimony? Isn't that what a fact-finding process should be all about? I think in some circumstances, a fact-finding process can go to those issues, but not in this circumstance. Because if that were the case, then you would always have a disputed fact. If someone said, you know, was the light red, and the person says, no, it wasn't, well, let's have a jury decide whether that person is telling the truth or not. That's exactly what the jury should do. Well, not if there's no evidence that Indwell ran a red light. If they say, I didn't run a red light, and there's no other evidence whether they did or not. And an eyewitness says that I ran the red light or I didn't run the red light. This is all factual material. Look, how many people at the scene here who were witnesses to what occurred? I'm just a little bit confused about that. You had the officers. Who else was there? Essentially, that's it. So there are no eyewitnesses, so to speak. None that have been there. So you're telling me that everything, as a matter of summary judgment, would rise or fall based upon the officers' testimony at their deposition. Yes. That's your position, all right? We have no other witnesses that have been located. And there are no witnesses that could be joined and nothing to be explored that would warrant a factual inquiry before a fact-finding. That's your position. Yes, correct, Your Honor. As I was saying with my example with the red light, if the only evidence you have is someone saying, I did not run the red light, I don't think that you have a disputed issue of fact where you can say, well, maybe that person's not telling the truth, so we'll quote them on the stand and let the jury decide that. There's no evidence to the contrary. What he says is, I don't know if I ran the red light. That's different. But he doesn't say, Officer Boose, he didn't say, I don't know. He said, I don't think so. Yeah, I mean. And even here, if you do have a momentary instance where the individual was able to push himself onto his chest, Officer Boose certainly says he never put the individual on his chest. But you have a whole bunch of factual dynamics. How big was this person? How much did he weigh? Some people say 200. Maybe he was 5'8", maybe he was 5'10". Maybe he's thrashing about at this point in time and not at a different point in time. Isn't there a congruence of all sorts of factual circumstances that would warrant, especially when you're dealing with the death here, a little bit more of a factual opportunity for the fact finder to assess all this? I don't think so. I think this is more similar to the Phillips case and to the Price case, where you have evidence of what was happening, and the plaintiff has to come forward with some evidence that the officers used excessive force. And it's not enough just to say someone died in police custody. This individual had an asthmatic condition. He was using an awful lot of methamphetamines, and the officers were trying to get him to the hospital as soon as they can so they could help treat his medical condition. And they were dealing with his problem the best they could. This wasn't an individual that they gang-tackled because he just robbed a store. They were trying to treat his medical condition. That's significant in the sense that he's not in custody. He's in protective custody, I guess. He's not suspected of any crime except perhaps possession of meth, but they weren't prosecuting him for that. They were just trying to get him to the ambulance. Correct. And all of a sudden they put in a hold that one might use on a fleeing suspect or a suspect you're trying to get under control to take into custody rather than get into an ambulance. So, I mean, I understand your position, but there is some inference that the hold contributed to the death. I don't know from where. There isn't any in the record that the hold contributed to the death. There isn't any in the medical examiner's report that the hold contributed to the death, and there isn't any from the testimony of the officers. The hold we're talking about is one arm, and he didn't even complete the hold. It's being moved down, almost up, and not quite. One arm while the person's on their side. There's not a scintilla of evidence that that maneuver in any way contributed to this individual's death, would have any effect on his breathing or his respiratory system. What they're trying to do is calm him down so they can wait for the ambulance. That's all, and that's undisputed. But they put handcuffs on him, they try the hold, and then they tie up his legs, and I understand he was either struggling for air under his theory or resisting the officers under your version. Either way, at that point what he was doing, he was banging his head into the concrete, and they thought he was going to kill himself that way. They were doing what they could to try to help this individual who was in distress by trying to keep him from bashing his head in. He was kicking at the officers, biting at the officers. That's undisputed. There's no dispute as to those facts, and the cases say that when someone is struggling on the ground and is kicking and struggling, that it's reasonable use of force to use a hobble to restrain that individual, and that's all he did, tying up his legs. Tell me what the manual says about use of chicken wing holds and, if anything, about hobbling, the San Francisco police manual. It doesn't speak to it. There's no discussion whatsoever in the use of chicken wing holds in the manual. The only discussion in the manual cited by appellant's counsel is it states that it advises against placing someone who's having difficulty breathing on the back of their chest, and that is exactly what Officer Busse was using the chicken wing. He was attempting to avoid. The facts are undisputed that Mr. Topolulu was on his side, and that's where Officer Busse was trying to keep him by using the hold. So what he was trying to do is exactly what the manual recommends, which is try to keep the individual from going onto his chest or his back. So in terms of whether there are undisputed facts about what he was doing, that's exactly what Officer Busse stated in his deposition. I had him on his side, and I was trying to keep him there from going on his back or to his chest by using this hold. He had to hold on him somehow, and that's using his arm, moving it up slightly, is what he attempted to do. He did exactly what he should do. And for a court to find that that creates a triable issue of fact is whether he used unreasonable force, I suggest it isn't appropriate because he did exactly what he should do in those circumstances, and there are no facts to suggest otherwise. The plaintiff's counsel's reference to the manual saying that the chicken wing hold causes respiratory problems is flatly untrue. There's nothing whatsoever in the manual about that. It's completely made up. And with respect to what the – So where did the officers get trained in the chicken wing hold? It's not in the manual. Well, I looked at page 107, and it does relate to how you address questions of difficulty breathing and so forth. So where did the officers get trained in this? In the academy. They get trained with all sorts of different holds. We don't have any written instructions on chicken wing holds? No, nothing. You won't find anything in the manual that discusses that word. No, there's some in the literature, but it's not in the manual. I haven't seen anything in the literature about chicken wing hold. We've had another case, so I can just tell you it's true. I'm not aware of that. To discuss this, there's issues related to hog tying, and that's not what this is. This injury was not hog tie. And using – moving an arm somewhat from a straight position, trying to get it so that it – and it's grabbing the elbow, I understand. That's what we're talking about. And that there's no evidence in this case, and none has been presented, that that caused any injury to Mr. Kapalalu, that it in any way decreased his ability to breathe, or was in any way inappropriate given the circumstances these officers faced with an individual who was on the ground, thrashing and causing himself serious injury. The question is, what should they have done? Should they have just stood back and said, okay, if we touch you, we're going to be sued for excessive force. So we're going to let you thrash around on the ground and bash your head into the sidewalk because then we can't get sued. Or do they step in and try to help this individual? What, if you know, was the interval between the time when he stopped breathing and the time that artificial respiration was attempted? Immediate. Well, they said they went. They went to get some protective gear first. So I'm just wondering what the interval was. My understanding is it was immediate. As soon as they noticed that he stopped breathing, they went to get from their car, which was right there, their respiratory device to assist with his breathing, removed the restraining devices and attempted to resuscitate him on their own. And an interesting thing in the Price case, that case where the court found that there was no triable issue of fact as excessive force, in that instance the officers did not attempt to revive the individual and waited until the ambulance came, even though they were trained to do so. These officers behaved in a much more manner, much more geared to protect this individual than the officers did in Price. The police report says that Officer Westbrook did chest compressions and Officer Busey did breathing. Is that using a breathing mask apparatus? Yes, a breathing mask. Or mouth-to-mouth? It's a breathing mask apparatus. That's what they're trained to do. Mouth-to-mouth can be extremely dangerous for the officers. They're trained to use the mask device for their own safety. Do you know how long the interval was? That's my question. Between the time when they leave, when the officer goes to the car to get the device, comes back and starts, is there anything in the record on that? I believe that they said they did it immediately as soon as they saw I stopped breathing. There was no evidence of any delay. No, there's a difference between immediately and going to the car and getting something and starting. I don't doubt that they didn't, I'm not disputing or saying they delayed it. I just want to know what the interval was. Do you know? I don't have the exact time. It may be in the computer-assisted dispatch as to how long it took, but they probably didn't record that. They just did it. I'm sure they didn't say, we're going to go do this. But their testimony in deposition and in declaration is as soon as they saw that he had stopped breathing, they immediately did what they needed to try to resuscitate him. And they can't do it beforehand, of course, because you can't resuscitate someone who's not breathing when they're still breathing. And before he stopped breathing, he was struggling and bashing his head into the concrete, and they thought he might kill himself that way, and they were trying to prevent that. Also similar to what the officers in Price did, where they used their foot to keep the individual from bashing his forehead into the concrete. And I submit that in this case, these officers, their conduct was far, was nearly as close to the line, perhaps, as the conduct in Price, and the court found that that conduct was not unreasonable as a matter of law. And I assume that that's the facts that we have here. Do you draw any distinction between those who are in protective custody and those who are detained because they are suspected of a crime in terms of our excessive force analysis? I think there could be in some cases, but not in this one. I think that in this case, that the custody this individual was in was related, was protective custody because they saw he was a danger to himself or others. The potential suicide attempt by appearing to be on methamphetamines, by the nature of the disorder of the room. He wasn't communicative with them. He didn't follow their instructions when they were telling him to calm down. They had him in handcuffs for that reason, because he was being detained. It wasn't as though they thought he was a violent felon, but this individual, they have to be protective of him and themselves. So your position, basically, if I understand your answer, is that if someone is detained lawfully, whether it is by virtue of lawful protective custody or custodial arrest, that the same rules of excessive force would apply. I believe that depends on what rules you're talking about. I believe that's correct. You do look at the totality of circumstances. I think this is clearly under the Graham analysis. You may have someone who maybe just committed a violent crime, but they're not resisting. Handcuffing them and binding their legs may not be appropriate in that circumstance if they're not doing anything that warrants that. Here, someone who wasn't suspected of doing a violent crime was behaving in a way that made that appropriate for his safety and for the officer's. So I think the analysis is the same in looking at the totality of circumstances. So in this case, the difference would be, let's say hypothetically, that there was no reason to take him into protective custody. In other words, you credit what your opponent argues and says, look, it was under control, he was having an asthma attack, they had no legal justification or justification of the facts to cuff him, take him downstairs and so forth. I'm just asking it hypothetically so you don't fight me on the facts on it. Under that circumstance, if he's right, does that change your analysis on whether in this case or not? I think it would change the analysis quite a bit. If we assumed that it was a violation of the law to take him into custody or to detain him or to take him into protective custody, I think it's a different issue. If we assume that he was just in his house watching TV and the police just kicked the door in and put him in cuffs and dragged him out and said we're taking him to the hospital for no reason at all, we've got a different case. This was an individual they thought was about to kill himself standing on the ledge of the fifth floor of a building, and the family didn't call the police and say, hey, my husband's standing on the ledge, he might kill himself. The officer saw that, and to protect this individual's safety, he went upstairs to try to help him out, saw that this individual was probably under the influence of methamphetamines or some serious drug, was right, saw this individual wasn't communicative, and was a danger himself. How would you see a different case? In either case, you'd have to show what the police did, you know, caused his death, wouldn't you? Yes. That would be common to either scenario. I guess I was getting away a bit from the other aspects of the case in terms of the excessive force. If we're talking about excessive force, that's correct. You have to show what the officers did caused the individual's death, and there's no evidence of that here. But if you're talking about if there was a claim that was, you know, inappropriate to detain him or inappropriate to put his handcuffs on, then I would see it differently. Right. Well, that's what the claim is here, and whether or not there's sufficient facts to tender to create a genuine issue, a material fact, is, I suppose, an issue. But if you assume that he says, all right, I'm just having an asthma attack, I wasn't trying to commit suicide, I'm fine, I just called the ambulance because I need to go, and they say, well, we're going to take you downstairs and cuff him, does it make it a different case or not here? Well, there is an evidence that he said that. Assume it hypothetically just so I can focus you in on the legal question. I think that we would look at the circumstances, the officers, the total circumstances the officer had to face as to whether it would be reasonable under those grounds for them to detain the individual. If he just said, oh, yeah, I'll come with you, and there was no – they saw no threat or potential threat to himself or others, then I think it's a different – to put him in handcuffs, I think it's a different circumstance. But remind me, who called the ambulance, the police? The police did. The police did. Yes, they called the ambulance, and they were trying to help him with whatever problems he's having. He's maybe suicidal. They don't know. He's standing on a ledge. He appears to be intoxicated, and he's having trouble breathing. And this guy is having a lot of difficulty right then, and he's not protecting himself, nor is anyone with him. And they decided that they needed to protect him and try to get him to an ambulance as soon as they could – a hospital as soon as they could. And that's what they were doing. And whether it's reasonable for the officer to handcuff in that circumstance, I think we submit those facts that it's – the case law is clear that when you're taking someone into detention, if they look like they can pose a threat to themselves or to you for officer safety, that it's appropriate to handcuff. The room was in shambles. He appeared to be on drugs, he wasn't communicative, and he appeared to be committing suicide. It was appropriate and reasonable for the officers to take the minimal precaution for their safety and his to place him in handcuffs. And there was no problem with him being handcuffed. He didn't resist being handcuffed. He didn't struggle. He didn't get the handcuffs on and start thrashing around. He walked. They took the elevator down with the officers holding him by one arm while he was handcuffed. But it would be – if, in fact, the detention was unlawful, it would be a Fourth Amendment violation for an improper seizure, but that would not necessarily translate to an excessive force. No, it's a different analysis, and this is a claim based on excessive force. Plaintiff's entire theory is excessive force. The entire motion is based on excessive force. There was no false arrest, unreasonable detention claim. No, but you did argue it this morning. That's why I wanted to – Well, it was the first time he argued that. It's not – in his complaint, it's not – Yeah, but that's why I wanted to respond to you on that. Yeah, this is an – your honor is correct. This is an excessive force claim, and the claim is that putting handcuffs on was the force that was excessive, and that's not when you're doing a reasonable detention, whether it's an arrest or a detention for someone who you think may be a danger to themselves or others. Any further questions? Thank you, counsel. Thank you. If there is no right to seize, then there's no right to use force. That's what I took from your argument, but I don't think you pled that, did you? Pardon me? I don't think that's in the pleadings of the case. You don't what? I don't think that's in the pleadings of the case. I understood that you argued it this morning. Well, the question is what type of force is reasonable. Under Graham, they have the four factors that use the crime. The crime is used because that creates the right to use force, the right to seize. If you don't have the right to seize, you don't have the right to use force. The right to seize comes with it the right to use force. That's why Penal Code 835A says the officer can use force, reasonable force, to arrest the person and also that he can overcome that person's resistance. But that's for a public offense, and that's one of the difficulties is because typically Graham involves a public offense. In this case, which is actually one of the few cases that actually deal with the issue of a civil protective custody seizure, you have different factors. But in order to have the right to seize, whether it's a public offense or civil protective custody, you have to have the right to seize. And under the protective custody, you have imminent danger as a result of a mental disorder. So what do you think in the record indicates a genuine issue of material fact on immediate danger? In other words, there's undisputed he's out on the ledge. But see, once he's on the ledge, the reason why the officers went to the unit is because they had to investigate what the problem was. In other words, if he had a toy gun and he was short pointed at his head from outside, he said, we might have to go see this guy. Once they got there and said, oh, this is a toy gun, he's okay, he's no longer an imminent threat to himself as a result of a mental disorder, because they realized what the situation is. At that point in time, they no longer have a right to seize. And therefore, the right to use force is not there. And under the government's right to use force is that which it is compelled to do. And here, they're not compelled to do anything. And what they do do is contrary to their purpose. The intrusion is the highest. So Fourth Amendment, taking a man from his home. The governmental interest is to help him. They take the highest intrusion, and their purpose is not served in any way. It's just the exact opposite. And I would just note, the chicken wing hole is what the person with his hands handcuffed behind his back. If you pull up one elbow, you bring up both. And a significant fact in this case is what defendants argued. The argument that he was going from a sitting position and throwing his head into the cement is a complete fiction. And in June, the officer in the statement said that's what he was doing, and in the police report. Where do you have anything in the record that says that the cause of death was because of the police behavior? Where? Well, we never got to that, because we were trying to determine whether or not there was a the force used was reasonable or unreasonable. And the court believed that Mr. Tappalooza was going from a sitting position and thrusting his head into the cement, which is a fiction, according to Still have to have something to oppose a summary judgment motion that shows that there's some causal connection between what the police officer did and the cause of death. Where do you have that in this record? There are several items, but one of the medical, the key item would be the medical testimony. That he died from asthma and perhaps drugs. It doesn't say that it was because the police did anything. Well, it says that the police conduct contributed to it, and that's the probable cause. But there's two issues. First is whether there's any of the medical reports here say that the police conduct contributed to his death. Correct. Correct. The defense does not have any item that says whether the police conduct had anything to do with his death. And the record, once it's more fully established, there will be an undisputed item as to whether or not... Except that the coroner's report says that he died of asthma. Well, that's correct. And that is correct, he died of asthma, but he had trouble breathing, and the restraining process is what further impeded his difficulty, which causes death. So there's two items, one is the legal cause, and the other is the medical cause. The legal cause is whether or not the police conduct was a substantial factor in bringing about it. And so that's why you need medical expert testimony with regard to the cause of death. But the trial court relied upon the defense argument that he was going from the sitting position, thrusting his head into the ground. And that's what they stated both in their deposition and in their statements prior to the final statement in September. And the reason for that is because the video images show that him going from a sitting position into the cement is a fiction. And the court should not, for summary judgment purposes, adopt that fiction, because it clearly didn't happen. And they acknowledge it. In Westbrook's deposition, for example, initially he states that Mr. Tapalooloo was in a sitting position, thrust his head down, and came back up and thrust his head down three times. In his statement, he doesn't say that, and that's because the video images show something. You have nothing here that says that because of all of that, this was the cause of his death. Is there anything in the record that says that, any medical test? Yes, it says that it contributed to it. Who said that? That would be Dr. Smith. It contributed to it. It's not the sole cause, and that's not what we're saying, but that's not what is required under causation. Just that it is a substantial factor, that's all that would be needed. But the first item is whether the conduct itself is a violation. And under Alexander v. City and County of San Francisco, once you have the conduct that's unlawful, you have a violation. And then the restraining process would be an item that would go to causation. And Blinkenstein v. Smith, they highlight that where they indicate their provocative actions are objectively unreasonable, the Fourth Amendment violation is established. And that's what we believe occurred here. What the officer did in attempting to use the chicken wing hole was unreasonable. And again, the thing that the very act that avoids, according to the defendant, liability is Mr. Tapalula Lua getting out of the chicken wing hole. Had he stayed in it, then we wouldn't be, the defense wouldn't be arguing, and has not argued, that to use the chicken wing hole is itself unreasonable. The first time this argument that the chicken wing hole itself is not unreasonable is presented here. Nowhere in any of the pleadings is there any suggestion that this chicken wing hole is reasonable. And in fact, the --. Counsel, you're over your time, so you should wrap up. No, it's the other way. Well, and based on the chicken wing hole, there's no, the defense, and at the trial court, no one has ever disputed that the use of the chicken wing hole would be reasonable. That is clearly unreasonable, it impedes breathing for a breathing-impaired person. It's as most, it's as unreasonable as one can contemplate. All the cases say that, they say if you have an impaired person, a diminished capacity person, you have to take that into account when you deal with them. Common sense tells you that, the police report says, the police manual says that 5325.1 says don't use unreasonable restraints in addition to unnecessary force. We believe that this case is one for the constitutional violation of excessive force is one as a matter of law. At the very least, it's one, it's a genuine question of fact as to whether the conduct was reasonable. And therefore, we would ask that the court either return this matter with the determination that excessive force was used, or to have that determined by the court. Thank you counsel, thank you both for your arguments.
judges: Thomas, Bybee, Block